UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
ABILENE DIVISION

DISABILITY RIGHTS TEXAS,

     Plaintiff,

v.

                                No. 1:21-CV-124-H

RICKY BISHOP, in his official capacity as
Sheriff of Taylor County,

     Defendant.

## MEMORANDUM OPINION AND ORDER

The Protection and Advocacy for Individuals with Mental Illness Act (PAIMI) empowers state-established protection and advocacy (P&A) organizations, like Disability Rights Texas (DRTx), to investigate the abuse of persons with a mental illness. To do so, the Act provides that P&A organizations "shall . . . have access to all records of . . . any individual" who is a client. Taylor County Sheriff, Ricky Bishop, denied DRTx's records request for security-camera footage of an alleged inappropriate restraint of its client. But PAIMI specifically names bodily restraints as a type of abuse subject to P&A investigations. And although the statutory definition of "records" provides examples that do not mention video recordings, the list is not exhaustive. The ordinary public meaning of "records" at the time of PAIMI's enactment encompasses video records, and the statute does not otherwise limit "records" to those produced as part of the care, treatment, or investigation into the abuse of a particular P&A client, as Bishop suggests. PAIMI's text, structure, and grant of broad investigatory powers conflict with Bishop's constrained reading of "records" and indicate that the term includes video recordings of alleged abuse. Bishop's denial of the records request violated PAIMI, and he must produce the video records.

1.      **Factual and Procedural Background**

      A.      **Factual Background**

Under PAIMI, the Developmental Disabilities Assistance and Bill of Rights Act (DD Act), and the Protection and Advocacy of Individual Rights Act (PAIR)—collectively the "P&A Acts"—Congress provided for state-established protection and advocacy organizations to investigate the abuse or neglect of persons with a disability or mental illness. *See* 42 U.S.C. §§ 10801–27 (PAIMI); 42 U.S.C. §§ 15041–45 (DD Act); 29 U.S.C. § 794e (PAIR). DRTx is the designated P&A organization for Texas and is charged with protecting and advocating for the civil rights of persons with a disability or mental illness. Dkt. No. 1 at 3.

In October 2020, DRTx received a complaint that B.W., an individual with mental illness, was inappropriately placed in a restraint while in custody of Taylor County Detention Center. *Id.* at 4. DRTx opened an investigation based on these allegations and obtained B.W.'s written consent to access his records. *Id.* Pursuant to its records-access authority under Section 10805(a)(4)(A), DRTx asked Bishop to provide B.W.'s medical records, mental-health records, and video footage of his restraint. *Id.* at 5. With respect to the video-footage request, Bishop sought and received an opinion from the Texas Attorney General, who opined that that videos were not records of the detainee and need not be produced. *Id.*; Dkt. No. 27 at 2. Accordingly, Bishop complied with the first two requests but refused to provide DRTx with the video footage. Dkt. No. 1 at 5. Bishop concedes all of these facts (Dkt. No. 14 at 1–2) but adds that the video footage was from a security camera filming the general area where B.W. was placed in a restraint chair for a period of time (Dkt. No. 27 at 2).

### B.    Procedural Background

In June 2021, DRTx filed suit against Sheriff Ricky Bishop in his official capacity as the Sheriff of Taylor County and requested that the Court:

> (a) Enter a permanent injunction enjoining the Defendant, his agents, or employees from denying DRTx immediate access to any and all video records pertaining to B.W.;

> (b) Issue a permanent injunction against Defendant and his successors to prevent Defendant and his successors from denying all future video records requests by Plaintiff DRTx concerning individuals with disabilities confined in Defendant's facility;

> (c) Issue a declaratory judgment that Defendant's policies, regulations, and practices of continuing to deny DRTx full, complete, meaningful, and timely access to Taylor County Jail video records violated and continues to violate the P&A Acts;

> (d) Award Plaintiff DRTx its reasonable and necessary attorneys' fees and costs pursuant to 42 U.S.C. § 1988; and

> (e) Award Plaintiff any other relief that the Court deems just and equitable.

Dkt. No. 1 at 7.  Bishop duly answered, admitting the bulk of DRTx's factual allegations but denying that the requested security-video footage was subject to authorized disclosure by federal statute.  Dkt. No. 14.

In March 2022, DRTx filed a motion for summary judgment, requesting the injunctive and declaratory relief listed in its complaint.  Dkt. No. 24.  In his response, Bishop "agree[d] with most of the facts as stated by the Plaintiff in its brief" and did not contest that B.W. authorized DRTx to have access to his records.  Dkt. No. 27 at 2. Bishop's sole contention is that "records" under Section 10805(a)(4)(A) does not include the security-camera footage sought.  Dkt. No. 27 at 1.  DRTx replied.  Dkt. No. 28.

2.    **Legal Standards**

A.    **Summary Judgment**

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  Movants must cite to particular parts of the record to show the absence of a genuine dispute or to explain why the cited materials do not create a genuine dispute.  Fed. R. Civ. P. 56(c)(1).  The Court must consider materials cited by the parties but may also consider other materials in the record.  Fed. R. Civ. P. 56(c)(3).  "[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986).  The substantive law identifies the material facts.  *Id.* at 248.

B.    ***Chevron* Deference**

"[A]dministrative implementation of a particular statutory provision qualifies for *Chevron* deference when it appears that Congress delegated authority to the agency generally to make rules carrying the force of law, and that the agency interpretation claiming deference was promulgated in the exercise of that authority."  *United States v. Mead Corp.*, 533 U.S. 218, 226–27 (2001).  "Delegation of such authority may be shown in a variety of ways, as by an agency's power to engage in adjudication or notice-and-comment rulemaking, or by some other indication of a comparable congressional intent."  *Id.* at 227.

If such delegation of authority exists, a court must first determine "whether Congress has directly spoken to the precise question at issue" or whether the "statutory text is ambiguous" as to that issue.  *Sw. Elec. Power Co. v. United States Env't Prot. Agency*, 920 F.3d

999, 1014 (5th Cir. 2019) (quoting *Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837, 842 (1984)).  "Only if the statutory text is ambiguous can the court proceed to step two, asking whether the agency's construction of the statute is 'permissible.'"  *Id.* (quoting *Chevron*, 467 U.S. at 843).  "A permissible construction is one that reasonably accommodates conflicting policies that were committed to the agency's care by the statute." *Gulf Fishermens Ass'n v. Nat'l Marine Fisheries Serv.*, 968 F.3d 454, 460 (5th Cir. 2020) (cleaned up and citation omitted).  An agency interpretation "can fail *Chevron* step two if it is contrary to clear congressional intent or frustrates the policy Congress sought to implement" or if it is "arbitrary, capricious, or manifestly contrary to the statute."  *Sw. Elec. Power Co.*, 920 F.3d at 1028 (cleaned up and citations omitted).  But a permissible agency interpretation of an ambiguous statute is binding upon courts.  *Mead*, 533 U.S. at 227.

## C.    Permanent Injunction

A party seeking a permanent injunction must succeed on the merits and demonstrate: "(1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction." *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 156–57 (2010) (quoting *eBay Inc. v. MercExchange, LLC*, 547 U.S. 388, 391 (2006)); *see Env't Tex. Citizen Lobby, Inc. v. ExxonMobil Corp.*, 824 F.3d 507, 533 (5th Cir. 2016).  Where a P&A organization establishes a state-defendant's violation of PAIMI or the DD Act by refusing to produce records, the P&A organization is entitled to an injunction requiring the production of the records.  *See Va. Off. for Prot. & Advoc. v. Stewart*, 563 U.S. 247, 255–57 (2011).

An order granting an injunction must "(A) state the reasons why it issued; (B) state its terms specifically; and (C) describe in reasonable detail—and not by referring to the complaint or other document—the act or acts restrained or required."  Fed. R. Civ. P. 65(d)(1).  "[A]n injunction is overly vague if it fails to satisfy the specificity requirements set out in Rule 65(d)(1), and it is overbroad if it is not 'narrowly tailor[ed] . . . to remedy the specific action which gives rise to the order' as determined by the substantive law at issue." *Id.* (quoting *Doe v. Veneman*, 380 F.3d 807, 818 (5th Cir. 2004)).

### D.    Declaratory Judgment

The Declaratory Judgment Act provides that, "[i]n a case of actual controversy within its jurisdiction . . . any court of the United States . . . may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought."  28 U.S.C. § 2201(a).  When considering an action for declaratory judgment, a "court must ask (1) whether an actual controversy exists between the parties in the case; (2) whether it has authority to grant declaratory relief; and (3) whether to exercise its broad discretion to decide or dismiss a declaratory judgment action."  *Frye v. Anadarko Petroleum Corp.*, 953 F.3d 285, 294 (5th Cir. 2019) (quotation and citation omitted). "'[A]ctual controversy' refers to an Article III case or controversy."  *Id.* (citation omitted). A district court lacks authority to grant declaratory relief and "may not consider the merits of a declaratory judgment action when: (1) a declaratory defendant has previously filed a cause of action in state court against a declaratory plaintiff; (2) the state case involves the same issues as those involved in the federal case; and (3) the district court is prohibited from enjoining the state proceedings under the Anti-Injunction Act."  *Travelers Ins. Co. v. La. Farm Bureau Fed'n*, 996 F.2d 774, 776 (5th Cir. 1993) (cleaned up).

3.    **Analysis**

Bishop argues that "records," under PAIMI, "certainly does not include videos" and that it only includes records produced as part of "the care and treatment" or "a specific investigation into allegations of abuse, neglect or injury" of the specific disabled individual whose alleged abuse a P&A organization is investigating—in this case, a detainee.  *See* Dkt. No. 27 at 2, 4, 5.  And because the security-camera footage was of a general area "that captures more than just the detainee at a particular time and place," Bishop argues that the video footage requested was not part of the "records" required to be produced to DRTx.  *Id.* at 1, 5.

The statute indicates otherwise.  Bishop's argument is contrary to the broad investigatory powers Congress bestowed upon P&A organizations.  And the ordinary public meaning of "records," as well as statutory structure and context, confirm that the term includes videos of a P&A client's alleged abuse or neglect.  This is so even if the video was made in the regular course of a housing institution's business and not as part of the care, treatment, or investigation of a P&A client.  Alternatively, assuming that the statute is ambiguous as to whether "records" includes videos of a P&A client, agency interpretation of the term includes general video recordings of a P&A client, and that interpretation is a permissible construction of the statute.  DRTx's video request is limited to a reasonable time period, and existing statutory protections adequately protect the privacy rights of other detainees.  Therefore, DRTx is entitled to the security-camera footage it requests.

**A.** **"Records," for purposes of Section 10805(a)(4), includes video evidence of a P&A client's alleged abuse or neglect.**

    **i.** **PAIMI empowers P&A organizations with broad monitoring- and records-access authority to investigate the abuse or neglect of individuals with mental illness.**

In 1986, Congress enacted PAIMI "to ensure that the rights of individuals with mental illness are protected" and to provide funding for states to establish independent P&A organizations to "protect and advocate the rights of individuals with mental illness" and "investigate incidents of abuse and neglect of individuals with mental illness if the incidents are reported to the system or if there is probable cause to believe that the incidents occurred." *See* 42 U.S.C. §§ 10801(b), 10803. In passing the statute, Congress found that "individuals with mental illness are vulnerable to abuse and serious injury" and "subject to neglect, including lack of treatment, adequate nutrition, clothing, health care, and adequate discharge planning." § 10801(a)(1), (3). Congress also found that "State systems for monitoring compliance with respect to the rights of individuals with mental illness vary widely and are frequently inadequate." § 10801(a)(4).

Under PAIMI, "abuse" specifically includes "the use of bodily . . . restraints on a[n] individual with mental illness which is not in compliance with Federal and State laws and regulations." § 10802(1)(D). Here, the subject of DRTx's investigation, B.W., was allegedly placed in an inappropriate mechanical restraint while in custody at Taylor County Detention Center (TCDC). Dkt. No. 25 at 8, 10. The term "system" refers to a P&A organization established under the DD Act, such as DRTx, and the "term 'facilities' may include . . . jails and prisons." *See* § 10802(2), (3). The parties agree that TCDC, a jail, was in custody of B.W., an individual with mental illness. Dkt. Nos. 25 at 10; 27 at 2. Therefore, TCDC is a facility subject to PAIMI.

PAIMI empowers P&A organizations with "the authority to . . . investigate incidents of abuse and neglect of individuals with mental illness" and to "pursue administrative, legal, and other appropriate remedies to ensure the protection of individuals with mental illness." § 10805(a)(1).  P&A organizations are required to "be independent of any agency in the State which provides treatment or services (other than advocacy services) to individuals with mental illness." § 10805(a)(2).  In other words, P&A organizations are intended to be independent watchdogs to keep accountable facilities in custody or care of individuals with mental illness.  And in furtherance of PAIMI's purposes, Congress provided P&A organizations with two distinct investigatory powers with respect to facilities subject to PAIMI: monitoring-access authority and records-access authority.  § 10805(a)(3), (4).

The monitoring-access provision provides that a P&A organization "shall . . . have access to facilities in the State providing care or treatment" to an individual with mental illness.  § 10805(a)(3).  And the records-access provision provides that a P&A organization "shall . . . have access to all records of . . . any individual who is a client of the system if such individual . . . has authorized the system to have such access."[1] § 10805(a)(4)(A).  It is undisputed that B.W. authorized DRTx to have access to his records.  Dkt. No. 27 at 2.

---

[1] Section 10805(a)(4) also provides records access by other means including through a complaint; activities giving rise to independent probable cause to believe that a client was subject to abuse or neglect; or by authorization of a legal guardian, conservator, or other legal representative. § 10805(a)(4)(A)–(C).

### ii.   The statutory definition of "records" is a non-exhaustive list of covered items, so ejusdem generis applies with less force.

The terms "records" is defined in Section 10806(b)(3)(A):

> As used in this section, the term "records" includes reports prepared by any staff of a facility rendering care and treatment or reports prepared by an agency charged with investigating reports of incidents of abuse, neglect, and injury occurring at such facility that describe incidents of abuse, neglect, and injury occurring at such facility and the steps taken to investigate such incidents, and discharge planning records.

42 U.S.C. § 10806(b)(3)(A).  The definition names three items that "records" covers: "reports prepared by any staff of a facility rendering care and treatment"; "reports prepared by an agency charged with investigating reports of incidents of abuse"; and "discharge planning records."  *Id.*

Bishop argues that this definition is limiting and that the covered items constrain the scope of its reach.  *See* Dkt. No. 27 at 3.  But the word "includes" is "non-limiting" and indicates that the definition is "non-exclusive."  *See DIRECTV, Inc. v. Budden*, 420 F.3d 521, 528 (5th Cir. 2005); Garner's Dictionary of Legal Usage 439–40 (3d ed. 2011) (explaining that "the word including itself means that the list is merely exemplary and not exhaustive"). Variations of the word "include" appear in other definitions in PAIMI, and their respective contexts make clear that the definition is not limited to the series of terms that follows.  *See, e.g.*, §§ 10802(1) (defining "abuse" to "include[] acts such as . . . the use of bodily or chemical restraints" among other things), 10802(3) ("'facilities' may include, but need not be limited to . . ."), 10802(5) (defining "neglect" to "include[] an act or omission such as . . .").  Thus, Section 10806(b)(3)(A) provides a non-exhaustive list of examples that are subsumed within "records" and does not address whether "records" includes videos.

Bishop argues that the enumeration of two types of "reports" and discharge-planning records within the definition suggests that "records" only includes items of the same type. Dkt. No. 27 at 3–5.  Discharge-planning records are written records, and the word "reports," as used in the definition, suggests a written or spoken account of things observed. *See Report*, Webster's Third New International Dictionary, Unabridged (1981).  And "[w]here general words follow an enumeration of two or more things, they apply only to persons or things of the same general kind or class specifically mentioned."  Bryan A. Garner & Antonin Scalia, Reading Law: The Interpretation of Legal Texts 199 (2012) (explaining the ejusdem generis canon).  Thus, the ejusdem generis canon suggests that "records" could be limited to written or spoken records.

However, the Court does not "woodenly apply limiting principles every time Congress includes a specific example along with a general phrase."  *Ali v. Fed. Bureau of Prisons*, 552 U.S. 214, 227 (2008) (refusing to limit "any other law enforcement officer" to the enumerated "officer of customs or excise" in the FTCA).  "[T]he rule of ejusdem generis applies only if the provision in question does not express a contrary intent."  *Cooper Distrib. Co. v. Amana Refrigeration, Inc.*, 63 F.3d 262, 280 (3d Cir. 1995) (Alito, J.) (citations and emphasis omitted).  Numerous courts have found that phrases like "including, but not limited to" express a contrary congressional intent, indicating that a definition of a general term is non-exhaustive and should not be constrained based on the specific terms listed in the definition.  *See, e.g.*, *id.* ("Thus, since the phrase 'including, but not limited to' plainly expresses a contrary intent, the doctrine of ejusdem generis is inapplicable.") (citations and emphasis omitted); *United States v. Migi*, 329 F.3d 1085, 1088 (9th Cir. 2003) ("[W]e need not apply ejusdem generis because Congress modified its list of examples with the phrase

'including, but not limited to.'  That phrase mitigates the sometimes unfortunate results of rigid application of the ejusdem generis rule.") (cleaned up); *United States v. West*, 671 F.3d 1195, 1198–99 (10th Cir. 2012) (same).

Here, Section 10806(b)(3)(A) uses the word "includes" rather than "including, but not limited to," but both expressions connote that the specific terms that are enumerated and subsumed in a general term are not a complete and exclusive list of covered items. Accordingly, the Court finds that ejusdem generis applies with less force here because Congress used the word "includes" to provide a non-exhaustive list of items covered by the general term "records."

Multiple circuit courts agree.  For example, in *Hammons*, the Tenth Circuit rejected the defendants' argument that "records" only encompasses patient records and not hospital records.  *Ctr. For Legal Advoc. v. Hammons*, 323 F.3d 1262, 1270 (10th Cir. 2003).  The court noted that "[p]eer review or quality assurance records involving the care of an individual could easily fit within that definition of records, along with myriad other records relating to an individual and/or his or her care."  And in *Hartford Board of Education*, the Second Circuit held that "records" also includes contact information for individuals with mental illness and their parents or guardians.  *Conn. Off. of Prot. & Advoc. for Persons with Disabilities v. Hartford Bd. of Educ.*, 464 F.3d 229, 244–45 (2d Cir. 2006) (Sotomayor, J.).  Neither court strictly limited "records" to the two types of reports and discharge-planning records listed in Section 10806(b)(3)(A).  This Court will not either.

> iii.  **The Court finds that "records" includes videos, in accord with its ordinary public meaning at the time of enactment.**

Absent a statutory definition that conclusively excludes videos from the meaning of "records," the Court turns to the ordinary public meaning of "record" to ascertain whether

videos are excluded.  Modern usage of "record" includes "something on which sound or visual images have been recorded," such as a file, disc, or magnetic tape, and definitely includes videos.  *See Record*, Merriam Webster, https://www.merriam-webster.com/dictionary/record (last visited July 15, 2022).  But given that PAIMI was enacted in 1986, the Court must inquire into the term's "ordinary meaning . . . as understood at the time of enactment." *Carcieri v. Salazar*, 555 U.S. 379, 379 (2009); *see also Director, OWCP v. Greenwich Collieries*, 512 U.S. 267, 275 (1994).

A contemporary dictionary published five years before PAIMI was enacted defines the noun "record" as: "something (as a monument) on which a record has been made"; or "evidence, knowledge, or information remaining in permanent form (as a relic, inscription, document)." *Record*, Webster's Third New International Dictionary, Unabridged (1981). This definition is incredibly broad and even includes inscriptions on monuments and relics—not just writings on documents.  *See id.*  While videos are not mentioned in the noun definition of "record," the verb definition states "to cause (sound, visual images) to be transferred to and registered on something (as a phonograph, disc, magnetic tape) by mechanical usu[ally] electronic means."  *Id.*  So the original public meaning of "record" at the time of enactment is broad and encompasses video and audio recordings.

In sum, absent contrary congressional intent, the Court interprets "records," for purposes of Section 10805(a)(4), to include videos in accord with its ordinary public meaning at the time of enactment.

> iv. **"Records" includes a security-camera video of a P&A client's alleged abuse or neglect, even if the video was not made as part of his care, treatment, or investigation.**

Having found that "records" includes videos, the Court must separately determine whether "records" includes security-camera footage of an individual with mental illness who is the subject of a P&A organization's investigation. While Bishop contests that "records" includes video records, he also concedes that "[h]ad the video been done as part of B.W.'s care or treatment, or made as part of an investigation, then it would arguably be part of his record as contemplated by Congress." Dkt. No. 27 at 5. However, Bishop argues that "general security camera [footage] that captures more than just the detainee at a particular time and place," as opposed to videos produced as part of a particular detainee's care, treatment, or investigation, "is not part of the record" accessible to a P&A organization. *Id.* Bishop's suggested limitation on the term "records" is contrary to statutory text, context, and structure.

> a. **The statute does not limit "records" to those produced as part of the care, treatment, or investigation into the abuse of a particular P&A client.**

PAIMI entitles a P&A organization to "have access to all records of . . . any individual" who is a subject of the P&A system. § 10805(a)(4). Bishop relies on the phrase "of . . . any individual" in Section 10805(a)(4), along with Section 10806(b)(3)(A)'s non-exhaustive definition, to suggest that the text counsels limiting "records" to those exclusively produced as part of the care, treatment, or investigation into the abuse of a particular individual. *See* Dkt. No. 27 at 2–3. This limitation is contrary to the text.

To begin with, the use of the word "all" in Section 10805(a)(4) suggests a degree of comprehensiveness, but it does not necessarily mean a P&A organization must have

unfettered access to "records."  *See Halliburton, Inc. v. Admin. Rev. Bd.*, 771 F.3d 254, 266 (5th Cir. 2014) ("[W]e think Congress meant what it said.  'All means all.'") (citation omitted).  And again, Section 10806(b)(3)(A) only provides a non-exhaustive list of covered items and does not limit "records" to those documenting care, treatment, or investigation into the abuse of an individual with mental illness.  *See supra* Section 3.A.ii.  Furthermore, the phrase, "of . . . any individual," need not be read so narrowly—as Bishop suggests—to imply that a record must be exclusively produced for or regarding a particular individual.  The "preposition 'of' may be used to show connection or association, as well as ownership . . . and it seems clear that the term is used in the former sense here."  *Pa. Prot. & Advoc., Inc. v. Houstoun*, 228 F.3d 423, 427 (3d Cir. 2000) (Alito, J.) (citing Random House Dictionary of the English Language 999 (1967)) (construing "records" in Section 10805(a)(4) to include peer-review reports belonging to a hospital rather than an individual patient).

Numerous other circuit courts have similarly construed "of any individual" broadly to include peer-review reports and quality-assurance records that do not belong to a patient or arise out of his care.  *See, e.g.*, *Hammons*, 323 F.3d at 1270 (holding that "records" includes peer-review reports and quality-assurance records); *Prot. & Advoc. for Persons with Disabilities, Conn. v. Mental Health & Addiction Servs.*, 448 F.3d 119, 124–26 (2d Cir. 2006) (Sotomayor, J.) ("Here, the definition of the word 'of' that indicates possession or ownership would render a significant part of § 10806(b)(3)(A) a nullity."); *Ind. Prot. & Advoc. Servs. v. Indiana Fam. & Soc. Servs. Admin.*, 603 F.3d 365, 382 (7th Cir. 2010) (peer-review reports); *Mo. Prot. & Advoc. Servs. v. Mo. Dep't of Mental Health*, 447 F.3d 1021, 1023–24 (8th Cir. 2006) (peer-review reports).  And at least one circuit court has held that a P&A organization may obtain a directory of individuals with mental illness and contact

information for their parents or guardians pursuant to its records-access authority. *Hartford Bd. of Educ.*, 464 F.3d at 244–45.

Thus, the statutory text and the cases interpreting Section 10805(a)(4) confirm that "the statutory phrase 'all records of . . . any individual' is quite broad." *Hammons*, 323 F.3d at 1270. Neither the phrase "of any individual" nor the statutory definition requires "records" to be limited to those exclusively produced as part of the care, treatment, or investigation into the abuse or neglect of a particular individual.

> **b.**   **Bishop's suggested limitation on "records" would yield an absurd curtailment of P&A organizations' records-access authority.**

Congress enacted PAIMI, in part, "to assist States to establish and operate a protection and advocacy system for individuals with mental illness which will . . . investigate incidents of abuse and neglect of individuals with mental illness if the incidents are reported to the system or if there is probable cause to believe that the incidents occurred." § 10801(b)(2)(B). And the term "abuse" specifically includes "the use of bodily or chemical restraints" as well as other acts such as "rape or sexual assault"; "striking"; and "the use of excessive force." § 10802(1).

Here, DRTx received a complaint that an individual with mental illness was inappropriately placed in a mechanical restraint, and it duly opened an investigation into the alleged abuse. Dkt. No. 25 at 10. DRTx, of course, wants the video that captures the alleged abuse at issue, but Bishop asserts that the statute does not authorize this access. Dkt. No. 27 at 1–2. But if the Court were to adhere to Bishop's suggested limitation on the term "records," a P&A organization would be able to access records documenting abuse of its client only when the abuse occurred incident to the care, treatment, or investigation into

the abuse of the client.  *See* Dkt. No. 28 at 5.  This would categorically exclude from a P&A

organization's investigatory powers records related to the abuse of P&A clients in contexts

other than care, treatment, or investigation.  Congress sought to empower P&A

organizations to "investigate incidents of abuse and neglect of individuals with mental

illness" generally and not only those incidents that are in a therapeutic or investigatory

context.  *See* § 10801(b)(2)(B).  And given that abuse or neglect of individuals with mental

illness can occur in many different settings, it is incredible that Congress would categorically

exclude a broad range of non-therapeutic and non-investigatory conduct that constitutes

abuse or neglect from a P&A organization's records-access authority.  Such a result is

clearly absurd and militates against adhering to Bishop's construction.  *See generally Tex.*

*Brine Co., LLC v. Am. Arb. Ass'n, Inc.*, 955 F.3d 482, 486 (5th Cir. 2020) ("In statutory

interpretation, an absurdity is not mere oddity.  The absurdity bar is high, as it should be.

The result must be preposterous, one that 'no reasonable person could intend.'") (quoting

Bryan A. Garner & Antonin Scalia, Reading Law: The Interpretation of Legal Texts 237

(2012)).

> ### c. Bishop's suggested limitation would render the inclusion of nonfeasance in the definitions of "abuse," "neglect," and "records" surplusage.

In PAIMI, the term "abuse" includes a "failure to act," and the "term 'neglect'

means a negligent . . . omission by any individual responsible for providing services in a

facility rendering care or treatment."  § 10802(1), (5).  Thus, Congress included the

investigation of nonfeasance with respect to individuals with mental illness as one of the

authorized activities of P&A organizations.

The statutory definition of "records" includes "reports prepared by an agency charged with investigating reports of incidents of abuse, neglect, and injury occurring at such facility that describe incidents of abuse, neglect, and injury occurring at such facility and the steps taken to investigate such incidents." § 10806(b)(3)(A).  So Congress also placed investigations of omissions and failures to act within the records-access authority of P&A organizations.

But given their nature, omissions and failures to act are often not recorded in a report or written records.  Videos, unlike written records, can capture a failure to act when action is necessary.  And P&A organizations often rely on interviews or video footage—rather than institutional reports documenting care, treatment, or investigations—to investigate and substantiate their clients' claims of abuse or neglect.  *See, e.g., Disability Rts. Pa. v. Pa. Dep't of Hum. Servs.*, No. 1:19-CV-737, 2020 WL 1491186, at *2 (M.D. Pa. Mar. 27, 2020) (noting that a P&A organization "interviewed residents and reviewed records at the Center, including videos of physical restraints of residents by Center staff").  If "records" are limited to those written records produced as part of the care, treatment, or investigation into the abuse of a particular P&A client, as Bishop suggests, the inclusion of nonfeasance in the definitions of "abuse," "neglect," and "records" would be rendered surplusage.  Congress's grant of records-access authority, specifically to investigate nonfeasance, would be vitiated.  And P&A organizations would not be authorized to obtain records of nonfeasance that they are congressionally charged to investigate and substantiate.

> **d.** **Even if the Court adhered to Bishop's suggested limitation, security-camera footage falls within "records" produced as part of the "care" of a detainee.**

"Care" is a broad term and covers "giving attention both to possible dangers, mistakes, and pitfalls and to ways of minimizing those risks." *Care*, Black's Law Dictionary (10th ed. 2014); *see also Care*, Webster's Third New International Dictionary, Unabridged (1981). Congress, in passing PAIMI, found that "individuals with mental illness are vulnerable to abuse and serious injury." 42 U.S.C. § 10801(a)(1). And it is common knowledge that, in some situations, individuals with mental illness can pose a physical danger to themselves and, therefore, must be monitored via camera or restrained for their safety. Here, B.W. was put in a restraint chair and monitored through a security camera, and Bishop concedes that both actions were for the protection of the detainee. *See* Dkt. No. 27 at 1 ("Security cameras are in place for the protection of all detainees."), 2 ("The placement in the restraint chair was . . . due to the need to protect the detainee from himself."). Thus, by Bishop's own admission, the security-camera footage is a record produced as part of the "care" of B.W. While Bishop seems to limit "care" to "healthcare," that limitation is not required by the statutory definition. *See* § 10806(b)(3)(A).

> **e.** **Caselaw indicates that video evidence of a P&A client's alleged abuse or neglect is subject to records-access authority.**

Although there is not much caselaw applying Section 10805(a)(4) to video recordings, existing cases indicate that general video footage of reported incidents of abuse, including inappropriate physical restraint, is subject to PAIMI's records-access provisions.

For example, in *Disability Rights Pennsylvania*, the district court did not interpret the term "records" within Section 10805(a)(4), but it noted that the P&A organization, as part of an investigation into abuse of a resident, "reviewed records at the Center, including

videos of physical restraints of residents by Center staff."  2020 WL 1491186, at *2.  And in *Buckeye Ranch*, the P&A organization sought video recordings from the defendant based upon reports of inappropriate restraint techniques used on youths with mental illness. *Disability Rts. Ohio v. Buckeye Ranch, Inc.*, 375 F. Supp. 3d 873, 878 (S.D. Ohio 2019).  The defendant complied with many of the records requests, including video recordings of restraint techniques used on four youths in the defendant's custody.  *Id.* at 878.  Unsatisfied, the P&A organization filed a motion for a preliminary injunction, requesting "restraint logs, logs reflecting denial of privileges, peer review logs, video recordings of an entire day, and information about the staff who were involved in the restraints."  *Id.* at 876, 886–87.  The court granted all of these requests and added only that the "records must be limited to a reasonable time period."  *Id.* at 891, 898.

Neither case states that the video footage accessed was taken by a camera exclusively dedicated to the allegedly abused individual, and the incredible breadth of the video records obtained in *Buckeye Ranch* is another indication that records-access authority under Section 10805(a)(4) is quite broad.  Thus, the existing caselaw indicates that general video footage of reported incidents of abuse are subject to access by a P&A organization under Section 10805(a)(4).

### B.     Alternatively, assuming that the statute is ambiguous, agency interpretation of "records" includes videos of a P&A client's abuse or neglect, and that interpretation is a permissible construction.

In the alternative, the Court assumes for the sake of argument that PAIMI is ambiguous as to whether "records," for purposes of Section 10805(a)(4), includes video records of a P&A client's abuse or neglect.  Operating under that assumption, agency

interpretation that includes videos of a P&A client's abuse or neglect would be accorded *Chevron* deference.

### i. Pursuant to its delegated authority, HHS issued a final rule including videos within "records" under Section 10805(a)(4).

Congress expressly authorized the Secretary of the Department of Health and Human Services to promulgate regulations to carry out the provisions of PAIMI. 42 U.S.C. § 10826(b). And in exercise of that authority, HHS issued a final rule specifying that "electronic files, photographs or video or audio tape records" are subject to the records-access authority of P&A organizations under Section 10805(a)(4). *See* 42 C.F.R. § 51.41(c). Thus, videos are included within "records" under the HHS rule.

### ii. The Court finds that HHS's interpretation of "records" also includes videos of a P&A client's abuse or neglect.

The HHS rule does not specifically state that general security-camera videos are included within a P&A organization's records-access authority. However, the rule states that "[i]nformation and individual records," including videos, shall be available to a P&A organization. § 51.41(c). By using the word "[i]nformation" in addition to "individual records," the HHS rule suggests that non-individual-specific information would be subject to access by a P&A organization. *Id.* Furthermore, the HHS rule provides a non-exhaustive list of items included within such "[i]nformation and individual records." *See* § 51.41(c)(1)–(5). The rule states that "[i]nformation and individual records" include those "obtained in the course of providing intake, assessment, evaluation, supportive and other services"; "[p]rofessional, performance, building or other safety standards"; and "demographic and statistical information relating to the facility." § 51.41(c)(1), (5). This HHS interpretation goes beyond the care, treatment, or investigation limitation on "records" suggested by

Bishop.  Nothing in the rule suggests that general security-camera footage is excluded from the videos subject to access by a P&A organization.  Accordingly, the Court finds that HHS's interpretation of "records," which includes videos without further qualification, includes videos of a P&A client's abuse or neglect.

### iii.   The inclusion of general videos in the HHS rule is a permissible interpretation of "records" in light of PAIMI's text and purposes.

PAIMI's stated purposes are "to ensure that the rights of individuals with mental illness are protected" and to assist States in establishing P&A systems that "investigate incidents of abuse and neglect of individuals with mental illness if the incidents are reported to the system or if there is probable cause to believe that the incidents occurred." § 10801(b).  HHS's rule, which subjects general videos to the records-access authority of P&A organizations under Section 10805(a)(4), accords with PAIMI's broad protective and investigative purposes.  *See* 42 C.F.R. § 51.41(c).  To the extent the statute manifests a conflicting policy of preserving the confidentiality of such records, the statute expressly provides that a P&A organization "has access to records which, under Federal or State law, are required to be maintained in a confidential manner by a provider of mental health services."[2] § 10806(a).[3]  And the statutory protections to preserve accessed records' confidentiality will be discussed below.  *See infra* Section 3.C.  The Court finds that HHS's inclusion of general videos in the term "records" "reasonably accommodates conflicting

---

[2] Neither party raises preemption issues in their briefs, and the Texas Attorney General opinion obtained by Bishop concedes that DRTx's "federal rights of access under the PAIMI . . . Act preempt state law."  Dkt. No. 27 at 12.  Therefore, the Court does not address the issue.

[3] The statute also provides an exception to records access "if the mental health professional responsible for supervising the provision of mental health services to such individual has provided the system with a written determination that disclosure of such information to such individual would be detrimental to such individual's health." § 10806(b)(1).  To the Court's knowledge, no such determination has been made.

policies that were committed to the agency's care by the statute." *Gulf Fishermens Ass'n*, 968 F.3d at 460 (cleaned up and citation omitted).

No statutory provision within PAIMI indicates that the inclusion of videos within "records" is "arbitrary, capricious, or manifestly contrary to the statute." *Sw. Elec. Power Co.*, 920 F.3d at 1028. To the contrary, the inclusion of videos within "records" accords with the ordinary public meaning of the term at the time of PAIMI's enactment. *See supra* Section 3.A.ii. Therefore, the Court finds that HHS's inclusion of general videos within "records" is a permissible interpretation of the term. Because it is a permissible interpretation, and assuming that the statute is ambiguous, the agency interpretation would be binding upon the Court. *Mead*, 533 U.S. at 227.

> **C.     DRTx's video request is limited to a reasonable time period, and statutory protections adequately protect the privacy rights of other detainees.**

The exact perimeters of how much and what kinds of video footage should be accessible to a P&A organization need not be determined by the Court here. It suffices to say that the security-camera footage that DRTx requests is reasonably limited to "a few minutes before the restraint was applied and after [B.W.] was released from the restraint" and is therefore comfortably within the records-access authority of DRTx. Dkt. No. 25 at 10; *see Buckeye Ranch*, 375 F. Supp. 3d at 891 ("The records must be limited to a reasonable time period."). The requested footage is allegedly 70 minutes long (Dkt. No. 25 at 10) and is far more tailored than the "video recordings of an entire day" that was ordered to be produced in *Buckeye Ranch*. 375 F. Supp. 3d at 886.

Bishop argues that disclosure of security-camera footage may violate the privacy rights—under the Health Insurance Portability and Accountability Act (HIPAA) and other laws—of other detainees, "even when the footage includes the detainee in question." Dkt.

No. 27 at 4.  But PAIMI requires P&A organizations that access records to "maintain the confidentiality of such records to the same extent as is required of the provider of [mental health services]."  42 U.S.C. § 10806(a); *see also Advoc. Inc. v. Tarrant Cnty. Hosp. Dist.*, No. 4:01-CV-062-BE, 2001 WL 1297688, at *5 (N.D. Tex. Oct. 11, 2001).  And in certain circumstances, the P&A organization is not even permitted to disclose such records to the individual who is the subject of investigation.  *See* § 10806(b)(1).  This duty of confidentiality is "especially significant" because P&A organizations have a "special function . . . to serve individuals with disabilities or mental illness."  *Disability Rts. Wis., Inc. v. State of Wis. Dep't of Pub. Instruction*, 463 F.3d 719, 728 (7th Cir. 2006).

It is unknown whether the video clip requested by DRTx contains footage of detainees other than B.W.  But, in any case, DRTx is subject to the same confidentiality requirements that the TCDC is subject to, and DRTx acknowledges this duty.  *See* § 10806(a); Dkt. No. 25 at 21.  "Given the duty of confidentiality common to both organizations, [DRTx]'s possession of the information seems no more troubling as a privacy matter than [the defendant]'s possession."  *Disability Rts. Wis., Inc.*, 463 F.3d at 729.  As to Bishop's HIPAA concerns, DRTx correctly notes that if—as Bishop insists—no healthcare or treatment appears in the video requested, then HIPAA would be inapplicable because HIPAA and its implementing regulations only protect disclosure of "health information."  *See* 42 U.S.C. § 1320d–2; 45 C.F.R. § 164.500; Dkt. No. 28 at 9 n.11.  Regardless, HHS regulations and guidance indicate that HIPAA does not bar a P&A organization from

accessing protected health information.[4]  The Court finds that existing statutory protections adequately protect the privacy rights of other detainees that may be in the video requested by DRTx.

*   *   *

For all the reasons stated, the Court finds that "records," for purposes of Section 10805(a)(4), includes video evidence of a P&A client's alleged abuse or neglect.  DRTx received a complaint from B.W. that officers had inappropriately restrained him—a type of abuse specifically enumerated by PAIMI and its implementing regulations.  Dkt. No. 1 at 4; 42 U.S.C. § 10802(1)(C), (D); 45 C.F.R. § 1326.19.  Based on this complaint, DRTx requested video footage from Bishop reasonably limited to the incident complained of by B.W.  Therefore, DRTx is entitled to receive the requested video footage from Bishop.

### D.   The remaining permanent-injunction requirements are satisfied.

"[A] host of federal authority holds that irreparable harm exists when a P & A system is unable to fulfill its [investigative] mandate under federal law, that the threatened injury of denying the injunction outweighs the harm caused by the injunction, and that granting the injunction would not disserve the public interest."  *J.H. ex rel. Gray v. Hinds Cnty.*, No. 3:11-CV-327-DPJ-FKB, 2011 WL 3047667, at *2 (S.D. Miss. July 25, 2011)

---

[4] A rule implementing the DD Act explicitly provides, "The Health Insurance Portability and Accountability Act Privacy Rule permits the disclosure of protected health information (PHI) without the authorization of the individual to a P&A system to the extent that such disclosure is required by law and the disclosure complies with the requirements of that law."  45 C.F.R. § 1326.25(e).  And the DD Act requires disclosure of healthcare information subject to its provisions providing P&A organizations records-access authority.  *See* 42 U.S.C. § 15043(a)(2)(I), (c).  While no similar regulation exists for PAIMI, HHS published a Q&A guidance indicating that HIPAA also does not bar disclosure of PHI to a P&A under PAIMI.  United States Department of Health & Human Services, May a covered entity disclose protected health information to a Protection and Advocacy system where the disclosure is required by law? (June 10, 2005), https://www.hhs.gov/hipaa/for-professionals/faq/909/may-a-covered-entity-disclose-information-to-a-protection-system/index.html.

(collecting cases).  And it is obvious that monetary damages are inadequate to compensate for a P&A organization's inability to access records that it is entitled to under federal law, as part of its congressionally authorized mission to investigate cases of abuse or neglect of individuals with mental illness.  *See Prot. & Advoc. for Persons with Disabilities v. Armstrong*, 266 F. Supp. 2d 303, 311 (D. Conn. 2003) (collecting cases).  The remaining requirements for the issuance of a permanent injunction are satisfied.  Therefore, the Court finds that DRTx is entitled to a permanent injunction.

### E.   The Court limits the scope of the permanent injunction to the video footage that DRTx requests.

DRTx requests a permanent injunction that covers more than Bishop's denial of immediate access to the video records pertaining to B.W.  Dkt. Nos. 24 at 2; 1 at 7. Specifically, DRTx requests that the Court issue a permanent injunction "enjoining [Bishop] and his successors from denying future video records requests by DRTx concerning individuals with disabilities confined in the Taylor County Detention Center."  Dkt. No. 24 at 2.  But the Court is required to "narrowly tailor" an injunction "to remedy the specific action which gives rise to the order."  *Scott*, 826 F.3d at 211 (citation omitted).  And DRTx fails to present evidence that Bishop has denied video-records requests on occasions other than for the investigation regarding B.W.  Therefore, the Court will not issue a broad injunction covering future conduct.  The Court limits the scope of the injunction to remedy Bishop's denial of video records pertaining to B.W.

### F.   DRTx is entitled to a declaratory judgment that Bishop's denial of the video request is a violation of PAIMI.

Neither party disputes that an actual controversy exists between the parties and nothing before the Court indicates that there is a pending state-court proceeding between the

parties that would divest the Court of its authority to grant declaratory relief.  Therefore, the Court finds that DRTx is entitled to a declaration that Bishop's denial of DRTx's video request is a violation of Section 10805(a)(4)(A).

**4.      Conclusion**

For the reasons stated above, the Court partially grants DRTx's motion for summary judgment (Dkt. No. 24) with respect to the following relief:

(1)      Defendant Ricky Bishop, his agents, or employees shall provide DRTx immediate access to all video records pertaining to the alleged restraint of B.W.; and

(2)      Defendant Ricky Bishop's denial of DRTx's video request pertaining to B.W. is a violation of 42 U.S.C. § 10805(a)(4)(A).

All other summary-judgment requests (Dkt. No. 24 at 2) are denied.  The Court will enter a separate judgment granting the stated relief.

So ordered on July 19, 2022.

_____
JAMES WESLEY HENDRIX
UNITED STATES DISTRICT JUDGE